UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EDWARD IAN ROBINSON,

       Petitioner,

                             CASE NO. 13-cv-12429
v.                         HONORABLE JOHN CORBETT O'MEARA

JEFFREY WOODS,

       Respondent.
_____/

**OPINION AND ORDER
DENYING THE HABEAS CORPUS PETITION,
DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, BUT
GRANTING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

      This matter has come before the Court on petitioner Edward Ian Robinson's *pro se* petition for the writ of habeas corpus under 28 U.S.C. § 2254. The habeas petition challenges Petitioner's convictions for possession of a firearm during the commission of a felony (felony firearm), Mich. Comp. Laws § 750.227b, conspiracy to commit armed robbery, Mich. Comp. Laws § 750.157a, Mich. Comp. Laws § 750.529, felon in possession of a firearm, Mich. Comp. Laws § 750.224f, and possession of burglar's tools, Mich. Comp. Laws § 750.116. As grounds for relief, Petitioner asserts that the trial court (1) erroneously denied his attorney's motion to withdraw from the case, (2) deprived him of his constitutional rights by excluding evidence of his co-defendant's juvenile adjudications, and (3) incorrectly scored several offense variables of the Michigan sentencing guidelines. Respondent Jeffrey Woods urges the Court to deny the petition on grounds that Petitioner's third claim is procedurally defaulted and not

cognizable on habeas review and that the state court's decision on his other claims was not contrary to, or unreasonable applications of, Supreme Court precedent. The Court agrees that Petitioner's claims do not warrant habeas relief. Accordingly, the petition will be denied.

## I. Background

### A. The Trial Testimony

Petitioner was charged in Washtenaw County, Michigan with the following seven crimes: armed robbery, felony firearm, unlawful imprisonment, breaking and entering a building, conspiracy to commit armed robbery, felon in possession of a firearm, and possession of burglar tools. The charges arose from a breaking and entering and robbery at a Value World store in Ypsilanti Township. A key witness at Petitioner's jury trial in Washtenaw County Circuit Court was his accomplice in the crimes, a juvenile whom the Court will refer to as J.D.

J.D. testified that Petitioner dated his sister and that, on the night before the robbery, Petitioner told him about a safe with money in it. When Petitioner asked J.D. if he was ready to "get a safe," J.D. responded that he was. The two of them then left the Huron Heights Apartments in a white pickup truck. They picked up a man at a house and then proceeded to some other apartments where Petitioner and the other man removed some latex gloves and a gun covered by a shirt from a car trunk. The men put the gun under the hood of the white truck, and they put the latex gloves inside the truck.

Continuing, J.D. testified that, after they dropped off the third man, he and Petitioner drove to a Speedway gas station across the street from Value World on

Michigan Avenue. Petitioner indicated that the safe was inside Value World. The two of them parked the truck behind some apartments near the gas station and walked across the street to the Value World store. Petitioner brought along a crowbar, rope, and the object, which was wrapped in the shirt. When they got to the back of the Value World store, Petitioner chipped at the wall with the crowbar and hammer in an effort to remove the bricks. While Petitioner was breaking a hole in the concrete wall, J.D. unwrapped the shirt, removed a bullet from the chamber of the gun that was wrapped in the shirt, and put the bullet in his pocket. The two of them then entered the store through the hole that Petitioner had made in the wall. They waited there for hours until three females and one male arrived. He (J.D.) was wearing white latex gloves and was holding a baseball bat. Petitioner also was wearing gloves and was armed with the gun that J.D. had seen earlier.

     Petitioner told the employees who had entered the store to lie down, and J.D. taped or cuffed the people's hands. Meanwhile, Petitioner took the manager to the front of the store. When Petitioner returned to the back of the store, he was carrying a plastic bag, and he told everyone to go into the bathroom. Petitioner used a rope to tie the bathroom door to the office door. He (J.D.) and Petitioner then went out the front door because they could not get out the back door. Once outside, J.D. ran across the street and got in the white pickup truck. He drove to a parking lot where Petitioner got in the truck. They drove back to the Huron Heights Apartments, but before they entered the complex, a policeman stopped them and told them to put up their hands. The gun was on the dashboard, and Petitioner told J.D. to run with it. J.D. refused and put the gun on

his lap. The two of them started to argue and when Petitioner refused to drive off, J.D. got out of the truck. The gun fell off his lap and hit the ground. A police officer then chased him, caught him, and handcuffed him.

None of the store employees confronted by Petitioner and J.D. on March 21, 2010, were able to identify the robbers. Joshua Marvin, the manager of the store, testified that everything looked normal when he and three or four other employees entered the store on March 21, 2010. But, as the group walked through the doors, he noticed a man on both sides of the doors. The larger man had a gun, and the skinnier one had a baseball bat that the employees kept in the back of the store for security purposes. The two men were dressed in black clothing, and their faces were covered. The gunman asked to be taken to the safe, and he told his accomplice to tie up the rest of the people. When they got to the safe, Marvin opened the safe and handed the money to Petitioner, who put the money in a white plastic grocery bag with the words "Thank you" on it. The money consisted of one-dollar, five-dollar, and ten-dollar bills and coins. Petitioner then directed Marvin to the back of the store where he ordered the employees to go in the bathroom. Marvin subsequently called the 911 operator on his cell phone. He and the other employees exited the bathroom after the robbers left the store.

Arloa Kaiser was waiting for Value World to open on March 21, 2010, when she saw some employees go into the store. She subsequently saw two men dressed in black clothing run out the front door to a nearby parking lot and get in a white pickup truck. One of the men was carrying a white plastic bag.

Taxicab driver Mikel Sherwood was parked at the Speedway gas station across from Value World on the morning of March 21, 2010.  He saw two men in dark clothes running away from Value World.  The smaller man was carrying a white plastic bag and got in a white Ford pickup truck.  The truck moved, but stopped when the bigger man came from between two houses.  The bigger man jumped in the driver's seat as the smaller man slid across the seat.  He (Sherwood) trailed the truck and got the license plate number off the truck.  He did not see the men's faces, but he provided the police with the number on the license plate.

Washtenaw County Deputy Sheriff Dean Reich heard an announcement about the armed robbery and immediately headed to the location of the robbery. On his way there, he noticed a white Ford pickup truck and license plate that matched the description of the suspects' vehicle.  He stopped the vehicle and detained the driver, whom he identified in court as Petitioner, and searched the vehicle.  The passenger in the truck took off running.  Inside the truck was a white plastic bag with a large amount of cash in it.  A handgun was lying on the ground outside the truck near the front passenger tire.

By the time deputy sheriff Douglas Ballou arrived at the location where Deputy Reich had stopped the truck, Petitioner was already in the rear of Deputy Reich's patrol car.  Ballou assisted in the search of the truck and determined that there was $570 in the white plastic bag found in the truck.  In addition, there was white powder all over Petitioner's shoes.

Detective Everette Robbins subsequently interviewed Petitioner who offered various explanations for the bag of money found in his truck on the day of the robbery. Petitioner offered bits of information and wanted to make a deal in return for providing more information about the incident. Petitioner asked to go back to his cell when Detective Robbins stated that he could not make a deal. On the way to his cell, Petitioner became very emotional and stated that he was a good person, but that he had "screwed up" and knew that his life was over because of what he had done. Petitioner also said that he did stupid things sometimes and that he wanted the store employees to know he would not have hurt them.

**B.  The Verdict, Sentence, Appeal, and Habeas Petition**

On September 30, 2010, the jury found Petitioner guilty of felony firearm, Mich. Comp. Laws § 750.227b, conspiracy to commit armed robbery, Mich. Comp. Laws § 750.157a, Mich. Comp. Laws § 750.529, felon in possession of a firearm, Mich. Comp. Laws § 750.224f, and possession of burglar's tools, Mich. Comp. Laws § 750.116. Because the jury was unable to reach a unanimous verdict on the remaining counts, the trial court declared a mistrial on those counts. On November 17, 2010, the trial court sentenced Petitioner to five years in prison for the felony-firearm conviction (second offense), followed by concurrent prison terms of twelve to thirty years in prison for the conspiracy conviction, two years, five months to five years for the felon-in-possession conviction, and two years, five months to ten years for the possession-of-burglar-tools conviction.

Petitioner raised his current claims on appeal from his convictions. The Michigan Court of Appeals affirmed his convictions and sentence in an unpublished decision, *see People v. Robinson*, No. 302274, 2012 WL 639342 (Mich. Ct. App. Feb. 28, 2012), and on July 24, 2012, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues. *See People v. Robinson*, 492 Mich. 855; 817 N.W.2d 71 (2012) (table).

On June 3, 2013, Petitioner filed his habeas corpus petition. He argues that (1) the trial court erred when it denied his attorney's motion to withdraw; (2) the trial court erroneously excluded evidence of a co-defendant's juvenile adjudications; and (3) he is entitled to re-sentencing because certain offense variables of the sentencing guidelines were incorrectly scored.

## II.  Standard of Review

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 562 U.S. 86, 97 (2011). Pursuant to § 2254, the court may not grant a state prisoner's application for the writ of habeas corpus unless the state court's adjudication of the prisoner's claims on the merits

- (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

- (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> Under the "contrary to" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., opinion of the Court for Part II).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and 'demands that state-court decisions be given the benefit of the doubt,' *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)." *Renico v. Lett*, 559 U.S. 766, 773 (2010).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his claims "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

8

### III. Analysis

**A. Denial of the Motion to Withdraw as Counsel**

Petitioner alleges that the trial court erred and deprived him of his constitutional rights when it denied his trial attorney's motion to withdraw from the case. Defense counsel moved to withdraw from the case about two and a half weeks before trial. The trial court denied defense counsel's motion after concluding that he and Petitioner had not established a sufficient breakdown in their relationship or "cause" for substitution of counsel. Petitioner raised the issue again on appeal, but the Michigan Court of Appeals determined that the trial court properly denied the motion to withdraw because there was no bona fide irreconcilable dispute.

**1. Clearly Established Federal Law**

The Sixth Amendment to the United States Constitution provides the accused in a criminal prosecution "the right to . . . have the Assistance of Counsel for his defense." U.S. CONST. amend. VI. "[I]mplicit in this guarantee is the right to be represented by counsel of one's own choice." *Linton v. Perini*, 656 F.2d 207, 208 (6th Cir. 1981). "[A] trial court, acting in the name of calendar control, cannot arbitrarily and unreasonably interfere with a client's right to be represented by the attorney he has selected." *Id.* at 209.

"[B]ut those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts. '[A] defendant may not insist on representation by an attorney he cannot afford.' " *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624

(1989) (quoting *Wheat v. United States*, 486 U.S. 153, 159 (1988)). Stated differently, "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006).

Furthermore, a trial court has "wide latitude in balancing the right to counsel of choice against the needs of fairness and against the demands of its calendar." *Id.* at 152 (internal and end citations omitted). "A motion for new appointed counsel based upon defendant's dissatisfaction with his counsel previously appointed is addressed to the sound discretion of the trial court." *United States v. White*, 451 F.2d 1225, 1226 (6th Cir.1971). Factors that courts may consider when reviewing substitution motions include: "the timeliness of the motion; the adequacy of the [trial] court's inquiry into the defendant's complaint; and the asserted cause for that complaint, including the extent of the conflict or breakdown in communication between lawyer and client." *Martel v. Clair*, 132 S. Ct. 1276, 1280 (2012). When evaluating the extent of the conflict between the defendant and his attorney, a court may consider whether the conflict "was so great that it resulted in a total lack of communication preventing an adequate defense." *United States v. Mack*, 258 F.3d 548, 556 (6th Cir. 2001).

### 2. Application

The trial court appointed counsel to represent Petitioner. *See* Washtenaw County Criminal Action Docket, ECF No. 9-1. Consequently, Petitioner had no right to an attorney of his choice. *Gonzalez-Lopez*, 548 U.S. at 151.

The state courts, moreover, reasonably concluded that the situation did not require substitution of counsel. The problem, according to Petitioner, was defense

counsel's advice to him about whether to plead guilty or go to trial and, if he chose to go to trial, whether or not to testify. Petitioner stated at the hearing on his attorney's motion to withdraw that his attorney had advised him it would not be good if he went to trial and testified, but that it also would not be good if he did not testify. Petitioner claimed that this led him to believe he had to plead guilty when he really wanted to have a trial. (Mot. Hr'g, 9-10, Sept. 8, 2010.) Petitioner went on to say at the motion hearing that he did not trust his attorney, and his attorney stated that there was a severe breakdown in communication at that point. (*Id.* at 11-12.)

      The trial court, however, explained to Petitioner that what his attorney had been doing was explaining Petitioner's options to him. And even though Petitioner maintains in his habeas petition that the trial court interrupted him when he tried to explain the situation and articulate his thoughts, the record indicates that the court was trying to prevent Petitioner from betraying the attorney/client privilege. (*Id.* at 10.) The trial court subsequently permitted Petitioner to express his thoughts, but concluded that Petitioner and his attorney had not demonstrated a sufficient breakdown in the relationship, nor shown "good cause" for substitution of counsel. The court then denied the motion without prejudice. (*Id.* at 11-12.)

      Petitioner never said that his attorney was pressuring him to plead guilty. Instead, as the Michigan Court of Appeals recognized, it appears that counsel was merely explaining the risks associated with the decision of whether or not to testify so that Petitioner could make an intelligent choice on the matter. And, despite the fact that the trial court denied the motion to withdraw without prejudice, Petitioner did not

complain about his attorney when the trial commenced on September 27, 2010. In fact, on the third day of trial when his attorney raised the issue of Petitioner testifying and stated that the decision was Petitioner's alone, Petitioner informed the trial court that he had nothing to say. (Trial Tr. Vol. III, 52-53, Sept. 29, 2010.)

Given the absence of a severe breakdown in the attorney/client relationship, as well as the lateness of defense counsel's motion to withdraw and the adequacy of the trial court's inquiry into Petitioner's complaint, the trial court did not abuse its discretion when it denied the motion to withdraw. Petitioner had no right to a meaningful relationship with his attorney, *Morris v. Slappy*, 461 U.S. 1, 2 (1983), and even though he expressed some dissatisfaction with his attorney, the conflict did not result in a total lack of communication preventing an adequate defense.

The state courts reasonably concluded that the extent of the conflict or the breakdown in communication was not so great as to require withdrawal and substitution of counsel. The Court therefore declines to grant the writ on the basis of Petitioner's claim.

**B. The Exclusion of Evidence**

Petitioner alleges next that the trial court erred when it excluded evidence that his co-defendant, J.D., had two juvenile adjudications for receiving and concealing stolen property. Petitioner contends that, because J.D. was the prosecutor's main witness, his credibility was a critical issue, and the trial court's evidentiary ruling deprived him of his right to present a complete defense, his right to confront the witnesses against him, and his right to a fair trial.

### 1. Clearly Established Federal Law

The Court begins its "discussion with the clearly established rule that errors in the application of state law, especially rulings regarding the admission or exclusion of evidence, are usually not to be questioned in a federal habeas corpus proceeding." *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988). Nevertheless, a defendant in a criminal prosecution is entitled to "a meaningful opportunity to present a complete defense," *California v. Trombetta*, 467 U.S. 479, 485 (1984), and to confront the witnesses against him, *Davis v. Alaska*, 415 U.S. 308, 315 (1974). But the Supreme Court has "never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability – even if the defendant would prefer to see that evidence admitted." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). Although the Constitution "prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote," trial judges may "exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006). And a habeas "court's duty 'is not to determine whether the exclusion of the evidence by the trial judge was correct or incorrect under state law, but rather whether such exclusion rendered petitioner's trial so fundamentally unfair as to constitute a denial of federal constitutional rights.' " *Lewis v. Wilkinson*, 307 F.3d 413, 420 (6th Cir. 2002) (quoting *Logan v. Marshall*, 680 F.2d 1121, 1123 (6th Cir. 1982)).

### 2. Application

Petitioner's claim arose on the first day of trial when the prosecutor moved to prevent defense counsel from impeaching J.D. with two juvenile adjudications for receiving and concealing stolen property. Defense counsel opposed the motion on the ground that the juvenile adjudications were highly probative of J.D.'s dishonesty. The trial court, however, granted the prosecutor's motion on the basis that the Michigan Rules of Evidence generally prohibit impeachment by evidence of juvenile adjudications and because the prejudicial impact of the evidence would outweigh any potential probative value for the jury in determining J.D.'s credibility. (Trial Tr. Vol. I, 9-12, Sept. 27, 2010.)

It was not fundamentally unfair to exclude evidence of J.D.'s juvenile adjudications because, as the trial court and the Michigan Court of Appeals recognized,

> the prior adjudications would have [had] little probative value on the issue of [J.D.'s] credibility. That is, [J.D.'s] credibility was put at issue the moment he walked into the court room wearing a jumpsuit and shackles. And on cross-examination, he admitted he was presently in custody. Defense counsel also questioned him regarding all the details of his plea agreement. The prior adjudications would have added little for the jury to consider when weighing his credibility.

*Robinson*, 2012 WL 639342, at *3.

Although the Supreme Court held in *Davis,* 415 U.S. at 308, that the petitioner was denied his right to effective cross-examination by the exclusion of evidence regarding a key witness's juvenile record, this case is distinguishable due to the scope of the cross-examination permitted. Defense counsel was permitted to ask J.D. about his current status as an inmate in a juvenile detention center. Counsel also asked J.D.

about his favorable plea agreement, which called for the dismissal of three of the same felonies that Petitioner was charged with (armed robbery, breaking and entering, and unlawful imprisonment). Additionally, defense counsel was permitted to question J.D. about his guilty plea to the charge of assault with intent to rob while armed. Defense counsel also elicited J.D.'s testimony that he was promised a sentence as a juvenile offender rather than as an adult. (Trial Tr. Vol. II, 139-44, Sept. 28, 2010.)

The Court concludes that defense counsel had an adequate opportunity to cross-examine J.D. regarding the truthfulness of his testimony and his motivation for testifying against Petitioner. The trial court therefore did not deprive Petitioner of his right of confrontation or his right to present a defense by precluding him from questioning J.D. about his juvenile adjudications for receiving and concealing stolen property. In the alternative, any violation of Petitioner's constitutional rights could not have had a "substantial and injurious effect or influence" on the jury's verdict and was harmless, given the strength of the evidence against Petitioner. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). Petitioner, therefore has no right to habeas relief on the basis of his second claim.

## C. The Sentence

In his third and final claim, Petitioner alleges that re-sentencing is required because several offense variables of the Michigan sentencing guidelines were incorrectly scored. Although Respondent contends that this claim is procedurally defaulted, "a procedural default . . . is not a jurisdictional matter," *Trest v. Cain*, 522 U.S. 87, 89 (1997), and a determination of whether Petitioner's claim is procedurally

defaulted "adds nothing but complexity to the case." *Babick v. Berghuis*, 620 F.3d 571, 576 (6th Cir. 2010). The Court therefore proceeds directly to the merits of Petitioner's claim.

Petitioner disputes the manner in which offense variables 1, 2, 12, 14, and 15 were scored, but the state court's alleged misinterpretation or misapplication of state sentencing guidelines "is a matter of state concern only." *Howard v. White*, 76 F. App'x 52, 53 (6th Cir. 2003). And "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Consequently, Petitioner's allegation about the scoring of the offense variables is not a cognizable claim on federal habeas corpus review. *Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007); *McPhail v. Renico*, 412 F. Supp. 2d 647, 656 (E.D. Mich. 2006); *Robinson v. Stegall*, 157 F. Supp. 2d 802, 823 (E.D. Mich. 2001).

Petitioner nevertheless alleges that he had a due process right to be sentenced on the basis of accurate information. The Supreme Court has stated that a sentence must not be based on "extensively and materially false" information, which the prisoner had no opportunity to correct through counsel, *Townsend v. Burke*, 334 U.S. 736, 741 (1948), or on "misinformation of constitutional magnitude." *United States v. Tucker*, 404 U.S. 443, 447 (1972). But the basis for Petitioner's argument is that, when scoring the offense variables for conspiracy to commit armed robbery, the state court considered conduct that occurred during the armed robbery. Petitioner argues that, because the jury acquitted him of armed robbery and the conspiracy was complete before he entered

16

Value World, the trial court should not have considered his conduct inside the store when scoring the offense variables for conspiracy to commit armed robbery.

The Michigan Court of Appeals, however, explained that,

> [a]lthough the crime of conspiracy is complete at the time the unlawful agreement is made, the conspiracy "continues until the common enterprise has been fully completed, abandoned, or terminated." *People v. Bushard*, 444 Mich. 384, 394; 508 NW2d 745 (1993).

*Robinson*, 2012 WL 639342, at *3. The Court of Appeals concluded that "the trial court properly considered the conduct that occurred during the armed robbery for purposes of scoring the [offense variables] for conspiracy to commit armed robbery." *Id.*

This Court is bound by the state court's interpretation of state law, *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005), and because the trial court properly considered conduct that occurred during the armed robbery, Petitioner was not sentenced on materially false information or on misinformation of constitutional magnitude. Petitioner therefore is not entitled to relief on the basis of his sentencing claim.

## IV. Conclusion

The state appellate court's adjudication of Petitioner's claims was not contrary to Supreme Court precedent, an unreasonable application of Supreme Court precedent, or an unreasonable determination of the facts. The state court's decision also was not "so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. The Court therefore denies the petition for a writ of habeas corpus and dismisses this case.

The Court declines to grant a certificate of appealability because reasonable jurists could not disagree with the Court's resolution of Petitioner's claims, nor conclude

17

that Petitioner's claims deserve encouragement to proceed further. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Petitioner nevertheless may proceed *in forma pauperis* on appeal if he chooses to appeal the Court's decision.


Date: September 9, 2015                           s/John Corbett O'Meara
                                                  United States District Judge


 I hereby certify that on September 9, 2015 a copy of this opinion and order was served upon the parties of record using the ECF system and/or by first-class U.S. mail.

                                                  s/William Barkholz
                                                  Case Manager